United States District Court
District of Massachusetts

|                                  |   |                      |
|----------------------------------|---|----------------------|
| UNITED STATES OF AMERICA,        | ) |                      |
|                                  | ) |                      |
|     Plaintiff, | ) |                    |
|                                  | ) |                      |
|     v.       | ) | Civil Action No.     |
|                                  | ) | 13-10107-NMG         |
| ALFRED PILIKA and VALERIE PILIKA, | ) |                     |
|                                  | ) |                      |
|     Defendants. | ) |                   |

## MEMORANDUM & ORDER

**GORTON, J.**

This case involves two naturalized Albanian-American citizens, defendants Alfred and Valerie Pilika ("the Pilikas"), who filed an application for asylum using false names in 1999, were ordered removed <u>in absentia</u> by an immigration court and subsequently applied for and became legal permanent residents of the United States in 2003 and naturalized citizens in 2008.

The United States brought this consolidated action in January, 2013 to revoke and set aside the decision admitting the Pilikas to citizenship and to cancel their Certificates of Naturalization. Cross-motions for summary judgment are currently pending before the Court and a bench trial is scheduled for July 22, 2014.

-1-

## I. Background

Alfred and Valerie Pilika were born in Albania and were married there. They fled Albania in 1991 due to political unrest and settled in Italy for several years. In October, 1998, the Pilikas lawfully entered the United States with visitor visas and remained for several weeks before returning to Italy. They returned to the United States permanently in February, 1999, again entering lawfully with visitor visas, and settled in Boston, Massachusetts.

The Pilikas were interested in remaining permanently in the United States as of their second entry in 1999 and were advised by members of the Albanian community in Boston to seek out a "notary office" in Astoria, New York that was known for helping Albanian immigrants. They visited the notary office twice during the summer of 1999. On their first visit, they spoke with employees of the office who charged the Pilikas $2,000 to help them stay in the United States. The notary office advised them to use different names to fill out their paperwork and provided them with a false address and persecution story to use in an application for asylum.

On June 25, 1999, Mr. Pilika signed a Form I-589 Application for Asylum that named Alfred Jani as the primary applicant and Valbona Jani and Violeta Jani as derivative applicants. The birthdates for those three individuals matched

the birthdates of Mr. and Mrs. Pilika and their daughter.  The
form claimed that Alfred Jani or a member of his family had been
mistreated or threatened by Albanian authorities for possessing
certain political beliefs and that he feared being tortured if
he returned to Albania.  It stated that the family had entered
the United States using false travel documents at JFK
International Airport in New York, which was not true.  The
application was prepared by an employee of the "Albanian
Assistance Centre" who gave his or her name as Lulzim Sula.  The
preparer wrote that his or her address was 27-15 Crescent
Street, Apartment 2B, Astoria, New York, 11102.[1]

During another visit to New York State on August 25, 1999,
Mr. and Mrs. Pilika were taken to a federal immigration office
in connection with the asylum application.  They provided their
aliases, Alfred Jani and Valbona Jani, and were photographed and
fingerprinted.  On the same date, Mr. Pilika met with Asylum
Officer Coleman to discuss his application.  Mr. Pilika did not
speak or understand English at the time but was assisted by an
interpreter who spoke Albanian.  At the end of the interview, he

---

[1] The copy of the Form I-589 Application for Asylum in the
summary judgment record (Docket No. 28, Ex. E) is missing pages
1 and 2 and does not include a mailing address for Mr. Jani.
The Court infers that the form stated that Alfred and Valbona
Jani resided at the 27-15 Crescent Street address from 1) the
admission of Mr. Pilika that he provided a false address and 2)
the fact that correspondence intended for Alfred and Valbona
Jani was later mailed to that address.

signed a form that explained that he and his family were required to appear at the asylum office on September 9, 1999 to receive the decision with respect his application.  Mr. Pilika claims that he does not remember signing that notice but does not deny that the signature is his.

The Pilikas maintain that they were uncomfortable with the advice of the notary office to change their identities and to submit a fabricated story of persecution and a false New York address.  They claim that they decided to abandon their application for asylum after the August 25, 1999 visit to New York and were unaware that it was ever officially filed with the United States government.  They attribute their failure to understand the implications of the I-589 Application and Mr. Pilika's meeting with the asylum officer to the language barrier and to the fact that things happened very quickly and were confusing while they were in New York State.

In any event, the Pilikas failed to return to the asylum office on September 9, 1999 to receive a decision on their application.  Two Notices to Appear on September 13, 1999 were sent to Alfred and Valbona Jani at the 27-15 Crescent Street address.  The Notices stated that the Janis were deportable because they had entered the United States without valid entry documents and ordered them to appear before an immigration judge on October 5, 1999 for removal proceedings.  The Pilikas

maintain that they did not receive the Notices to Appear because the 27-15 Crescent Street address was a false address. They did not appear at the removal hearing and an immigration judge ordered Alfred and Valbona Jani removed in absentia.

More than three years later, the United States Citizenship and Immigration Services ("USCIS") granted lawful permanent resident status to Mr. and Mrs. Pilika based upon their Form I-485 Applications to Register Permanent Residence or Adjust Status. In February, 2008, the Pilikas filed Form N-400 Applications for Naturalization in which they certified, under penalty of perjury, that their applications were true and correct. They did not disclose in the applicable section of the application that they had previously used the names Alfred Jani and Valbona Jani in an asylum application. Furthermore, they answered "no" to Part 10, Question 23, which asked

> Have you ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal?

They also answered "no" to Part 10, Question 28, which asked

> Have you ever applied for any kind of relief from removal, exclusion or deportation?

The Pilikas repeated those answers, under oath, in July, 2008, during interviews with USCIS officials. Prior to those interviews, the Pilikas submitted fingerprints as part of their applications. In September, 2008, the applications were

approved by the USCIS and the Pilikas took the Oath of Allegiance to become citizens of the United States.

Their files were reviewed by the Department of Homeland Security in September, 2012 as part of a larger investigation. An FBI Latent Fingerprint Specialist compared the fingerprints provided by Alfred and Valerie Pilika in 2008 with the fingerprints provided by Alfred and Valbona Jani in 1999 and concluded that they belonged to the same persons.

In January, 2013, the government filed separate Complaints against Alfred Pilika and Valerie Pilika. The cases were consolidated following a scheduling conference in May, 2013. In December, 2013, the United States and the Pilikas each moved for summary judgment. A bench trial is scheduled for July 22, 2014.

**II.  Cross-Motions for Summary Judgment**

    **A.  Legal Standard for Summary Judgment**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990)). The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

When, as here, the parties file cross-motions for summary judgment, the Court treats each motion separately and draws all reasonable inferences in favor of the respective non-moving party. Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013).

**B. Analysis**

"Few rights are as symbolically important ... as the right to acquire and keep American citizenship." United States v. Hutyrczyk, 803 F. Supp. 1001, 1006 (D.N.J. 1992). Nevertheless, a court may revoke and set aside an Order granting United States citizenship and cancel a Certificate of Naturalization if 1) the Order and Certificate were "illegally procured" or 2) the person obtained naturalization by "concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a).

Due to the potentially "severe and unsettling consequences" of losing the right of citizenship after it is acquired, a naturalized citizen may be stripped of his or her citizenship only if there is "clear, unequivocal and convincing" evidence in support of denaturalization that "leave[s] [no] issue in doubt". Fedorenko v. United States, 449 U.S. 490, 505 (1981).

The government proffers two separate grounds for revoking the citizenship of Alfred and Valerie Pilika under § 1451(a). First, it contends that they "illegally procured" their citizenship because they were subject to outstanding removal orders when they applied to adjust their immigration status to permanent United States residents in 2003 and therefore could not be lawfully admitted to permanent residence at that time. Second, it asserts that their citizenship was procured through "concealment or willful misrepresentation" because they failed

to disclose their previous application for asylum and use of the names Alfred Jani and Valbona Jani when they applied for and were granted naturalized citizen status.

### 1. Ineligibility to Adjust Status in 2003

Naturalization is said to be "illegally procured" if some statutory requirement that is a prerequisite to obtaining citizenship has not been met at the time the petition for naturalization is granted. Fedorenko, 449 U.S. at 506 (citations omitted). The United States contends that Alfred and Valerie Pilika illegally procured their citizenship because they were subject to outstanding removal orders in 2003 when they applied to adjust their immigration status to permanent resident status.

#### a. Statutory Framework

An applicant for naturalization must have 1) been lawfully admitted for permanent residence and 2) resided in the United States for at least five years after adjusting his or her status to lawful permanent resident. 8 U.S.C. § 1427(a)(1). To be eligible for lawful permanent resident status, an applicant must 1) apply for an adjustment of status, 2) be eligible to receive an immigrant visa, 3) be admissible to the United States for permanent residence and 4) have an immigration visa "immediately available" to him when he files his application. Id. § 1255(a).

An alien who has been ordered removed from the United States is ineligible to obtain an immigrant visa or admission

into the United States for 10 years following that order of removal. Id. § 1182(a)(9)(A)(ii). Moreover, an alien may be removed in absentia if the USCIS establishes by "clear, unequivocal, and convincing evidence" that 1) the alien or his attorney received written notice of the deportation hearing as required by 8 U.S.C. § 1229(a) and 2) the alien is removable under 8 U.S.C. § 1229a(e)(2) because, inter alia, he is inadmissible under 8 U.S.C. § 1182. Id. § 1229a(b)(5)(A). Finally, service of such notice of an upcoming deportation hearing is sufficient if there is "proof of attempted delivery to the last address provided by the alien...." Id. § 1229(c).

### b. Application

Under the applicable statutes, the in absentia order of removal rendered the Pilikas ineligible to adjust to lawful permanent resident status when they applied to adjust their immigration status in 2003. See id. §§ 1182(a)(9)(A)(ii); 1225(a); 1229a(b)(5)(A). Because they were ineligible to adjust their immigration status, the fact that they were permitted to do so at the time has no bearing upon the Court's decision. They could not be "lawfully admitted for permanent residence" based upon the interpretation of that term by the Board of Immigration Appeals to mean that

> an alien is deemed, ab initio, never to have obtained lawful permanent resident status once his original ineligibility therefor is determined in proceedings.

Matter of Koloamatangi, 23 I. & N. Dec. 548, 550 (B.I.A. 2003); see also Walker v. Holder, 589 F.3d 12, 19-21 (1st Cir. 2013) (according Chevron deference to that holding and finding that it accords with First Circuit precedent).

The fact that the Pilikas likely never received the notice of their deportation hearing and order of removal is irrelevant under the governing statute. The letters were mailed to the address provided on the Form I-589 Application for Asylum and that mailing sufficed to provide notice under 8 U.S.C. § 1229(c). It is no defense to assert that that notice was defective because it was sent to a false address. Moreover, Mr. Pilika signed a document that indicated that he understood that his family was required to return to the asylum office on September 9, 1999, to receive the results of his application, and yet he and Mrs. Pilika did not appear on that date.

Defendants contend that, because Mrs. Pilika did not sign the asylum application or attend the interview with her husband, she should not have been placed in removal proceedings. They cite no legal authority in support of that claim and, indeed, the Court is unable to find any case law or statutory authority that holds that a derivative asylum applicant cannot be ordered removed based upon false statements in an asylum application. Even assuming that the validity of the 1999 order of removal of

Valbona Jani is properly before this Court, the undisputed evidence is that Mrs. Pilika was aware that they were applying to stay in the United States under false names and even submitted to fingerprinting at a government office as part of the application process. Cf. Walker, 589 F.3d at 20-21 (affirming conclusion of the Board of Immigration Appeals that a minor who obtained legal permanent resident status through fraud committed by his relatives was not lawfully admitted for permanent residence); Garcia v. Gonzalez, 179 Fed. App'x 417, 418 (9th Cir. 2006) (unpublished opinion) (finding that the Board of Immigration Appeals acted irrationally in denying a motion to reopen removal proceedings where the petitioner had an unauthorized asylum application with an incorrect address filed on her behalf by a third party without her knowledge and therefore did not receive the notice of the hearing).

In summary, because the Pilikas were ineligible to adjust their status to lawful permanent residence, they failed to "strict[ly] compl[y] with all the congressionally imposed prerequisites of citizenship" under 8 U.S.C. § 1451(a). Fedorenko, 449 U.S. at 506; United States v. Demjanjuk, 367 F.3d 623, 636 (6th Cir. 2004) (alien failed strictly to comply with prerequisites for citizenship because he entered the United States using an invalid visa). The Court would so conclude even if it were convinced that Mr. and Mrs. Pilika believed in good

faith that they abandoned their application for asylum before it was officially filed with the government. Illegal procurement does not require a showing of fraud or misrepresentation. See, e.g., United States v. Dailide, 316 F.3d 611, 620 (6th Cir. 2003) ("Section 1451 makes no mention of a falsity requirement, but only requires an inquiry into whether citizenship was illegally procured."); United States v. Leprich, 666 F. Supp. 967, 969 (E.D. Mich. 1987) (noting the "illegal procurement can be established without proof of a misrepresentation"); United States v. Kairys, 600 F. Supp. 1254, 1269-71 (N.D. Ill. 1984) (same), aff'd, 782 F.2d 1374 (7th Cir. 1986).

The Court is, nevertheless, concerned by that plain meaning of the "illegal procurement" provision. Putting the facts of this case aside, the possibility that naturalized citizens with no intent to misrepresent or conceal material facts could be stripped of their citizenship years after being naturalized for failure to comply with minor procedural requirements is unsettling. Nevertheless, this Court lacks any equitable discretion to excuse failure to comply strictly with all procedural prerequisites in obtaining naturalized status. Fedorenko, 449 U.S. at 506. Alfred and Valerie Pilika failed to satisfy an important prerequisite prior to becoming naturalized United States citizens and the Court is therefore bound to

revoke and set aside the decision admitting them to citizenship and to cancel their Certificates of Naturalization.

### 2. Concealment or Willful Misrepresentation

Because the Court finds that the defendants illegally procured their United States citizenship, it will not address the alternative ground for denaturalization based on willful misrepresentation or concealment.

### ORDER

For the foregoing reasons,

1) plaintiff's motion for summary judgment (Docket No. 25) is **ALLOWED**;

2) defendants' motion for summary judgment (Docket No. 29) is **DENIED**;

3) the Court **REVOKES AND SETS ASIDE** the naturalization of Alfred Pilika and **CANCELS** his Certificate of Naturalization, No. 30514670, issued to him on September 10, 2008;

4) Mr. Pilika is **ENJOINED** from claiming any rights, privileges or advantages under any document that evidences the United States citizenship he obtained as a result of his September 10, 2008 naturalization;

5) Mr. Pilika is **ORDERED** to surrender and deliver to the Attorney General his Certificate of Naturalization and any copies thereof in his possession within 30 days of the entry of judgment, and to make a good faith effort to obtain and surrender any copies that he knows to be possessed by others;

6) Mr. Pilika is **ORDERED** to surrender and deliver to the Attorney General any other indicia of United States citizenship, including, but limited to, United States passports, voter registration cards and other voting

> documents, and any copies thereof in his possession within 30 days of the entry of judgment, and to make a good faith effort to obtain and surrender any copies that he knows to be possessed by others;

7) the Court **REVOKES AND SETS ASIDE** the naturalization of Valerie Pilika and **CANCELS** her Certificate of Naturalization, No. 30514669, issued to her on September 10, 2008;

8) Mrs. Pilika is **ENJOINED** from claiming any rights, privileges or advantages under any document that evidences the United States citizenship she obtained as a result of her September 10, 2008 naturalization;

9) Mrs. Pilika is **ORDERED** to surrender and deliver to the Attorney General her Certificate of Naturalization and any copies thereof in her possession within 30 days of the entry of judgment, and to make a good faith effort to obtain and surrender any copies that she knows to be possessed by others; and

10) Mrs. Pilika is **ORDERED** to surrender and deliver to the Attorney General any other indicia of United States citizenship, including, but limited to, United States passports, voter registration cards and other voting documents, and any copies thereof in her possession within 30 days of the entry of judgment, and to make a good faith effort to obtain and surrender any copies that she knows to be possessed by others.

**So ordered.**

                                        /s/ Nathaniel M. Gorton
                                        Nathaniel M. Gorton
                                        United States District Judge

Dated June 23, 2014